Good morning, your honors. Good morning. May it please the court, my name is Alexander Vellis. For the petitioner, Mr. Jones. I'm associated with the firm of Steptoe and Johnson. I request two minutes for rebuttal, if that is okay. Are you doing this on a pro se basis? Pardon me? Are you pro se? A pro bono. Yes, we are doing this on a pro bono basis, your honor. That's great. I think the courts really are very grateful to the bar for undertaking this. Your honor, thank you for those comments. We're grateful to have the opportunity to argue before this court. Thank you. May I begin? Yes, please. Your time is going to start running. Thank you. Your honors, the decision to deport any person to a country that engages in torture is a decision of the utmost gravity. And as this court is no doubt intimately aware, implicates the United States's treaty obligations not to do so under the UN Convention Against Torture. The solemn process by which this occurs is carefully delineated with the obligations and the responsibilities of the cadre of immigration judges and the Board of Immigration Appeals carefully spelled out. Now the process by which the BIA determined to deport Mr. Jones to Nigeria, a country that unquestionably engages in the widespread use of torture, was not that process. There are at least three deficiencies in this process. Each one a sufficient reason in and of itself to reverse the BIA decision or at the very least remand this matter to an immigration judge for further clarification and adjudication. First, I just want to say, we can't remand to the immigration judge. We can only remand to the BIA. Your honor, I thought Zubeda was actually authority for the fact that if it was unclear whether an admin, I'm sorry, whether an immigration judge had taken administrative notice of facts. And that's particular case, the Third Circuit did in fact remand directly to an immigration judge. What case was that? That's Zubeda. And that, I submit very respectfully, that is actually one of the situations that we have here where it's unclear and footnote one of the immigration judge's oral opinion. He mentioned that with respect to detention, he noticed that numerous experts that had appeared before him had opined that Nigeria does in fact pursue criminal charges against people who are deported to Nigeria with foreign convictions. And that, I submit very respectfully, your honor, is the administration, is the immigration judge taking what could be considered as administrative notice of this fact, butchersing his factual findings of detention. In McLeod, we concluded there was error for the judge to place on the record the county, or the county, the country report there. Is there any substantial difference between what was done there and here, taking administrative notice of a country report? What's different there than here? Well, your honor, this is actually a specialized piece of knowledge that immigration judges would have. They are administrative law judges. And it's very difficult for any documentary evidence to be produced with respect to the detention of all criminal deportees. An immigration judge put that on the record in his oral opinion. And he said, you know, for every other country except Haiti, there's a dearth of evidence with respect to detention. So therefore, I'm going to take notice that all these other experts that have appeared before me, numerous experts, as is at footnote one, I believe it's page two or three of the opinion, I'm going to take notice that these experts have opined that Nigeria does, in fact, pursue charges against deportees who have foreign convictions. Now, in this case, it was the BIA, not the IJ, who took administrative notice of a country report. Is that not correct? Well, your honor, I submit that the State Department country report was in the record, I believe, before the immigration judge. And the BIA, our position is that the BIA improperly reassessed and revalued that piece of evidence and turned a complete blind eye to the bulk of the record evidence. With respect to detention, the immigration judge made six specific, well, referenced six specific documents, made six specific findings with respect to detention. First, he looked to the Human Rights Watch report. And in that report, it is very well documented that throughout interrogation, Nigerian authorities engaged in the unquestionable and horrific use of torture. And this included electric shocks to the genitals, hangings, beatings, shootings. I mean, it was very, very well documented that incident to interrogation, the Nigerian authorities employ torture as a means of extortion and a means of extracting confessions from those criminal suspects. I'm sorry, Judge? I thought the crux of, this is Jones, right, we're talking about? Yes, yes, your honor. I thought the crux of this was not that Nigeria imposes torture that seemed to be accepted, but that there was no proof that he would be detained. He's not a drug suspect, he's a financial crimes person, right? Yes, your honor. And I think that was lacking. Now, I'm not talking about the evidence that was attempted to be submitted later. I'm talking about the evidence on the record at the time. Yes, your honor. Was that the problem? Your honor, that was the problem that the BIA had with our opinion. But we were very respectfully submitted that this matter should be controlled by Kaplan, a decision issued by this court just this past Friday in which this... What's Kaplan got to do with the fact of sufficiency of evidence? I mean, if their is no evidence, I mean, sufficiency, even a jury, sufficiency is a question. Yes. If the problem is sufficiency, then Kaplan doesn't really matter, does it? Well, I would still submit that in this particular case it does matter because the legal question of sufficiency was never reached by the BIA. The BIA only rejected the immigration judge's finding of fact, which under Kaplan is clearly a finding of fact in the matrix of facts that could be used in its totality to satisfy the legal standard of torture. But you're saying the IJ decided there was sufficient evidence of detention and he credited that evidence and found there would be detention. Yes, and that was a finding of fact, your honor, by the immigration judge, a specific finding of fact that was rejected by the BIA and under Kaplan that was an impermissible action. Are the BIA saying there wasn't really any evidence of detention and therefore he can't make that finding of fact or they're saying we're reweighing the evidence? They reweighed the evidence and the BIA also, we respectfully submit, committed very clear and glaring error when they mischaracterized Mr. Jones' testimony about whether or not the Nigerian authorities were waiting for him. I think that was, I think that's correct. That was a mischaracterization. He never said they won't pick me up. He basically said they weren't waiting for him on drug charges or earlier convictions. Yes, your honor. That was a mistake. That was a mistake and we submit that that was the mistake on which the BIA premised its decision to overturn the immigration judge's finding of fact. So even under a clearly erroneous standard, what's clear is that the BIA made Do you think that was a determinative fact on that? I think it contributed very substantially, your honor. I think it was the starting point of his decision and then he moved on to reassess the State Department country report and revalue that. He also turned a blind eye to Mr. Jones' testimony with respect to another Nigerian deportee, which the immigration judge did find was credible. And that Nigerian deportee did say that he was subject to torture upon deportation for having a foreign conviction. My apologies to you on my earlier question. I was on Subrata, not on Jones. Thank you, your honor. I was a little confused. You looked confused and I thought you were prepared for that. I wasn't prepared for it. No need to apologize, your honor. On our list, Subrata is the first one. So when you start talking about Nigeria. I see. I see.  That's right. Thank you, your honor. What do you think we ought to do in light of Kaplan? In light of Kaplan, I think there's very clear error here. Kaplan specifically said that this court has held that an immigration judge's findings of fact can only be reviewed for clear error. Absent clear error. That's what Kaplan says. That's right. Absent clear error. And the government's going to appeal that. The government will appeal that and we will oppose their appeal. Yeah, they're going to ask for cert. And we will oppose their petition for cert. Well, you may oppose it, but that doesn't mean the Supreme Court won't take it. Yes, exactly. In fact, I would submit to this court that the Second Circuit has actually recently issued a decision called Dela Rosa, which I believe backs up this court's decision in Kaplan. And in Dela Rosa, the court essentially held, without going as far as the Third Circuit, that an immigration judge's findings with respect, findings that support the legal conclusion, have to be reviewed for clear error. Now, correct me if I'm wrong, but the BIA didn't assert a right of de novo review. And wasn't this inserted by the government after the matter of DK? Yes, Your Honor. But what's interesting to note is that nowhere in the BIA's opinion do the words clear error or clearly erroneous appear. They actually use the word no substantial basis in the record. At four, no substantial basis in the record. Again, no persuasive evidence unsubstantiated. Now, in Kaplan, must the magic words be used, though? That sounds to me that he's describing or she is describing clear error. Even if, and as I submitted before, Your Honor, even if this was reviewed under a clear error standard, the BIA's decision itself was clearly erroneous in its characterization and misapplication of Mr. Jones' testimony. Also, a particular note, if you will indulge me one second. In Kaplan, this Court. I have a question. Go ahead. Oh, thank you, Your Honor. Also, a particular note is. I'm sorry, were you going to ask a question? No, no, you finish. Thank you, Your Honor. Also, a particular note is that in this, in Kaplan, this Court noted that the use of the term speculative was indicative of the reversal of factual findings under a de novo standard, which is impermissible BIA action. We have that particular word being used again by the BIA to dismiss an immigration judge's findings of fact at page four in the BIA decision. I think that's indicative of BIA's impermissible action under the standard of review. You've taken this a bit farther. Do you challenge the BIA's determination that he was statutorily ineligible for withholding a removal? Yes, Your Honor. Do you challenge that? We do. We do preserve that issue, and we believe that the ---- On what ground? He was convicted of a particularly serious crime, which the BIA said made him ineligible for withholding. And I thought you were moving on under a tag. Yes, we are. In Mr. Jones' brief to this Court, he preserved that issue. We didn't brief that particular issue in our supplemental brief, but Mr. Jones' argument essentially was that the Francescu factors weren't expressly followed. And even though I know a court does not have to expressly follow them, the circumstances and underlying facts of the conviction are such that the BIA should have at very least considered the sentencing information as mitigating. In fact ---- But wait a minute. Either he was convicted of a particularly serious crime or he wasn't. Was he convicted of a particular ---- I mean, can we say that the BIA was wrong on that? I think we can say that the BIA needs to reexamine the issue. I'm not entirely sure if we can say that they were wrong or not. Well, but they found it. What ground would we have to send it back to them and say, well, look at it again? I mean, usually you have to have committed error before we send it back. And we submit, Your Honor, that that error was the fact that they didn't look to the extent that Judge Jones committed this act, namely that his mother was hospitalized. But the reason is he either did it or he didn't. His good reasons or bad reasons, I mean, we don't let criminals come in and say, well, don't convict me of the ---- I didn't commit the crime because I had a good reason. I understand, Your Honor. I understand. And we're not making excuses here. We're merely submitting that the BIA should have at the very least taken that into consideration when they consider the circumstances and underlying facts and whether the circumstances indicate that the alien will be a danger to society. So your claim is really a cat claim? Our claim is a cat claim because you don't get to withholding unless you satisfy cat. And just as an ancillary matter, we would like to direct this Court to Zhang, the Zhang case, which is a Ninth Circuit case, which held that the BIA should examine the circumstances of whether or not a particular petitioner will be a danger to society. Thank you. We'll hear from this. Well, I just wanted to ask them a question about this footnote one in the IJ's report. Certainly, Your Honor. I'm not sure what this thing is. As an aside, the Court has the opportunity of hearing a number of witnesses, and the Court recalls that they admitted there was direct documentary evidence pertaining to detention, but they all affirm that Nigeria pursues criminal charges against citizens and nationals who commit foreign crimes. That's the finding of fact? No, Your Honor. That's, in my opinion, the judge's attempt or explicit action of taking administrative notice of the fact that Nigeria detains criminal deportees, or it's a fact that's incident to detention in the sense that if Nigeria pursues these criminal charges against foreign deportees who have foreign convictions, that buttresses. So it's kind of like judicial notice? It's like judicial notice. Is it well known in the world of BIA law that? Yes, Your Honor. We have to also, you know, we call them immigration judges, but they are in reality administrative law judges who have specialized bodies of knowledge, and that's what this doctrine allows them to do. Thank you very much. Thank you. Thank you. Thank you. We'll hear counsel for Mr. Sobrata. Is it Mr. Sobrata? He's a man. Sounds like it. Yes. Yes. May it please the Court? I am Victor Filippini of Holland and Knight, pro bono counsel for Petitioner Andre Sobrata. If I too may reserve. I'll say the same thing to you. Thank you. You're here on a pro bono basis? We are, Your Honor. Thank you. If I too may reserve two minutes of time for rebuttal, I'd appreciate that. I guess we have to give them both. Okay. Thank you. In light of this Court's recent decision in Kaplan v. Attorney General, the principal issues in our case are two. First, whether the administrative or the immigration judge and his findings of fact were clearly erroneous. And two, as a matter of law, did the findings satisfy the legal requirements under the Convention Against Torture of Mr. Sobrata being more likely than not to be tortured upon his removal to his homeland of Indonesia? The clearly erroneous standard only justifies the reversal of the immigration judge's finding of fact if any reasonable adjudicator would be compelled to conclude to the contrary. Here, because the IJ's findings were supported by substantial evidence, both testimony and documentary, and the reasonable inferences drawn from there are appropriate, at most the BIA's factual conclusions competed with the findings of the IJ. They did not compel a different conclusion. In both this case and in Mr. Jones' case, we would have to take the position that everybody who returns to Nigeria and to Indonesia is going to be detained and tortured. I can't imagine what that will do to our foreign relations with those countries. And so do you have anything specifically with respect to Mr. Sobrata? Certainly, Judge, I do. First, with respect to Mr. Sobrata, he will be going back as a criminal deportee, not just anyone who's coming back. He's not coming back in his tropical shirt and straw hat. Well, they're both going back as criminal deportees. That's what we get. Correct. But there are other people who may come back. It's not a matter of simply people coming back and being detained. It's a matter of the criminal deportees. But we're going to have to tell these countries that even though these people have been convicted of crime in our country, they're going to torture them when they come back. Well, I think there's more to it. Do you have to take that position? Because otherwise, don't you have to show something specific to Sobrata and something specific to Mr. Jones? With respect to Mr. Sobrata, I think that the record does show those specific items. As I say, he was a criminal deportee. That means when he comes back. Well, that's general. But when he comes back, that means he will have brought some dishonor to his country. That would at least raise a suspicion of that. Well, that's why they're going back. Secondly, when he applied for asylum and received it in this country, he did so after testifying against the human rights record of Indonesia. But even aside from that, Indonesia is not any other country. Indonesia has a particularly heinous record of torture with detainees. So you're agreeing with me that we would have to take the position that everybody who goes back to Indonesia is likely to be tortured? Of those who are criminal deportees, that was the finding. How many are they? Do you have any idea? I don't have any sense of the number, Your Honor. I would say that in the Zubeda case, there this court found that it was a reasonable inference to assume that someone going back to their country would, in fact, be detained. Detention itself is not at all unusual. The administrative judge here, the immigration judge, specifically found that that is a routine practice even in our country, that if someone is coming back from overseas as a criminal deportee, they will at least be detained. The trigger here is not the matter of mere detention, but what happens when they're detained. In Indonesia, the records are well established that the people in detention face torture. It was my understanding that Subrata did not put on any evidence on the record to support his claim that returned citizens of Indonesia are targeted and that they are imprisoned or that they are tortured. Did I read the record wrong? That is not correct, Your Honor. Okay. What was his evidence? There was testimony from Mr. Subrata specifically. Yeah, but he wasn't. I mean, he can't say that they're going to torture me. You have to say what happened to other people. No. What he did testify is that he expected to be detained upon return. That's irrelevant. Let's go to what evidence is there on the record to support your claim that people who go back to Indonesia are detained and then tortured. And I couldn't find any. Well, again, I think that what we had in terms of his own testimony, with all due respect, his own testimony can't support that conclusion. Judge, I guess we're asking two separate questions in this, and I think if we break down the questions. One question. What evidence is there? I think his testimony, his personal testimony could support it, but it has to be based on something. So what was it based on? His personal testimony was based on his belief that because of the statements he had made in asylum that he would be targeted. It was a subjective belief that because of his attempt to become an asylee that he would be branded a traitor. That's correct. That was part of his testimony. And one of the things that I would note is that there was no contradictory testimony or evidence otherwise presented in this record. So the uncontroverted evidence, which the immigration judge did find to be I don't think the immigration judge went off on the traitor business. He didn't find on the traitor business, but he specifically noted that it was expected that he would be held in custody. And the immigration judge took that one step further and said that it is not at all unexpected that someone coming in as a criminal deportee would be held and questioned in any country. What kind of finding of fact is it that it is, what did you just say, it is not unexpected? That's not a finding of fact. No, what the immigration judge did say is that he took judicial notice that that was the case. If you take a look at the Zubeda case, that same conclusion was reached, first by the immigration judge and then affirmed in the opinion itself as that being an expected outcome for a criminal deportee. Can I ask you a question? Unlike the case we just heard, I think in this case the BIA said that they were going on two alternative theories and that they actually had reviewed this for clear error and found it. So we don't really have a Kaplan problem in this case, do we? I think that we do because when we still look at their, it was in footnote one, where they said more or less gratuitously that, oh, we also looked at this and found it clearly erroneous. They found no facts contrary in the record. The only thing that they cited was a 2007 State Department report, the country report there, and they said things were getting better in Indonesia. Well, in fact, the 2005 and 2006 reports, which the IJ did have before it, the 2007 report came in after the IJ's decision. Those reports had substantially the same statement, but all three reports also reported that detention officials were routinely incurring physical abuse on detainees and were doing it with impunity, that torture was common in detention facilities, and that as a result what the BIA did was simply reshuffle the deck. They didn't find anything that was contrary to what the administrative law judge found. What they found was that they disagreed. Again, the standard is that it must be compelling that anyone would have found the opposite of what the immigration judge found. It wasn't something that they might find. It's not a competing rule. It's a compelling rule. There was nothing compelling. They all looked at the same evidence. They came to different conclusions. They didn't have very compelling evidence. But the fact finder in this case was the immigration judge. They didn't have much evidence to support what you call a fact. I mean, Jones' case is a lot stronger than Sobrano's, and in addition the BIA did say, and you can't say they just threw it away, did say that if they were using the clearly erroneous standard they would find it. But what they cited for that was none of the testimony of Mr. Sobrano. Well, I'm sorry. I just can't, unlike my colleague, I just can't give much credit to somebody's own testimony that he will be detained and tortured. We need harder evidence than that. It is, as we've just heard, subjective. Well, subjective though it may be, it's the only evidence in the record on that point. That's exactly right. It's the only evidence in the record, and that's what makes it less than compelling. But the BIA, well, no, the point is that it must be compelling for the reversal, not for the original conclusion. The only evidence in the record relates to the testimony as well as the country reports. The country reports, the BIA simply gave a new spin on those reports from what the IJ did. Thank you, Mr. Gould. Thank you. Good morning. May it please the Court.  Your Honors, in this case, I would first like to begin by noting that the government did file motions to hold these cases in advance on Friday afternoon. Yeah. I apologize for the late notice, but we got those filed as quickly as possible. We couldn't do more than we did. As soon as the opinions came out, I made sure that we didn't, the usual timing would have been they would have come out on Monday, and as soon as I saw they were coming out, I made sure that they pushed through it so that you people would at least have a weekend. But we don't expect you, and we made it clear in our order, we don't expect you to write at that time on, you know, on the effect of Kaplan, which I guess caused some consternation in your office. So what I'd like to know from you is what do you think we should do with these cases? Well, respectfully, Your Honor, the government's position would be as, as we set forth in our motions, which were filed on Friday afternoon, we respectfully request that the court hold both cases in advance pending the government's decision on whether to seek further review in both. Why shouldn't we send them back to the BIA to be reconsidered in light of Kaplan? Because we can't, I'm not prepared to assume that my colleagues opinion, which by the way, in our court, they clear that all the active judges will not be the, will not stand. Is there any reason why we should hold them in abeyance and just let them sit? Why shouldn't we send it back to the BIA? For all I know, the BIA will, for all we know, the BIA will say, oh, we better apply a different standard and come out just like you want. Well, respectfully that, that is one possibility. And I, well, I don't want to speculate on what this court may or may not do. I would submit that in the interest of judicial economy, that it would be better to hold these cases rather than send them back to the board. If in the instance that something that a different result does occur, which again would, it's pure speculation on my part, then. What kind of different result? You think the court will overturn its, its opinion that it just issued? Your Honor, again, seeing the opinion was just issued on Friday, the appropriate, uh, people have to confer and make a decision as to whether to seek further review of that decision in light of, in light of. Further review by whom? Either, uh, NBank or CERT, I suppose. But again, that, because it just came out Friday, my office hasn't had, uh, sufficient time. We understand, we understand that. To weigh that. Okay. Well, we'll have to decide what we think is the most expeditious thing for us to do. But go ahead. Yes, Your Honor, I would note that these two cases, although they both present similar facts, that we have two aliens who do not contest that they are both aggravated felons. And they're both, the common theme in these cases is that because we have the same immigration judge and a finding as to the likelihood of detention in their respect. I didn't notice that. You have the same IJ in both cases. It was the same immigration judge in both cases. And, I didn't notice that either. No. Your Honor, I, I think they're, I'm sorry. Yeah. I, I believe they're, they're a little bit distinguishable, the Jones and Suvatra case, because in Suvatra, the court clearly set forth that they were making alternative findings. They would review the immigration judge's findings under either de Novo or the clearly erroneous standard, and they would reverse on both. So as for sending them back, I would submit if the court decides not to hold these cases in advance, the Suvatra case should, his petition should be denied. I take it the error that the BIA found was Suvatra, I don't know how to say that, was that the immigration judge relied on insufficient evidence of detention? Absolutely. And, Your Honor, if I may note in this, in both cases. That was an absolutely agree that that's what they did. Okay. I, and I, and I think in both cases, the immigration judge himself said, in Suvatra's case, that administrative record pages 486 and 491, he said there is no evidence in this record that this person is likely to be detained. Well, he did. I, that's why I was questioning at the end of the last round with counsel was, there's this footnote that takes administrative notice of some other cases. And I'm not exactly sure how to handle that footnote one. Respectfully, I think that was in the Jones case, Your Honor. I'm sorry. I'm up here arguing both cases. I guess it's the same judge. So I'm thinking, okay. In the Suvatra case, he did not do that. So I think that's a much clearer, it's a, it's a clearly distinguishable because in Suvatra, he says there is no evidence in this record that this person is likely to be detained. He, and he, the immigration judge himself. So the footnote one was about Nigeria. It didn't have application to Indonesia. Correct. Your Honor. And I think in that case, it's even more important to note his repeated statements. There is no evidence in the record that this person is likely to be detained. If this person is not likely to be detained, his entire claim fails because he's not likely to be detained. His claim is based on torture while in detention. If, as the immigration judge says, he's not likely, if there's no evidence to show he's going to be detained, then clearly he would not be tortured because his claim is based on that. The immigration judge himself rejected the traitor claim at his, at page four of the immigration judge's decision that, that Mr. Suvatra proffered. As for the Jones case, the immigration judge, again, stated at multiple parts of his decision, there is no evidence that Mr. Jones is likely to be detained. If I may quote, there's no direct evidence that Mr. Jones is likely to be detained. There is a dearth of evidence. He did have the footnote. I would respectfully submit that that was not a taking of administrative notice. Normally, if an immigration judge wants to take administrative notice or judicial notice of facts not in the record, they clearly state it. As he said, this was just an aside. It appears that this was something the immigration judge was just mentioning. He did not, I believe that is. Well, then how did he get to his finding, his ultimate conclusion, if that wasn't taking a judicial or administrative notice? I mean, he must've gotten there somehow, but I think he made the same error in both cases. Respectfully, your honor. He even, he said, even though there's no evidence, I'm going to find that this person is likely to be detained. Let me ask you this. What should I make of what I think really was a BIA mistake about that testimony? Well, you know, I think, well, perhaps the BIA might've misperceived because he did testify as to he, they weren't waiting for him for a drug conviction. And I think that's important. That wasn't the basis of their finding. The basis of the BIA's decision was as the immigration judge said, there's no evidence that this person is going to be detained. In fact, if I may, you admit it's a mistake, but you think it was, I think arguably, immaterial mistake. I think arguably it's an immaterial mischaracterization. And even then, I think his testimony wasn't exactly clear. And I would point out. We're talking about Jones now. Mr. Jones. And I would point out in both of these cases, they are distinguishable from Kaplan because in Kaplan, you had an expert witness who said, if these individuals go back, if this individual goes back to, I believe it was the Ukraine. Yeah. He will be detained and tortured. He was Jewish. Yeah. Neither of these aliens, Mr. Jones or Sabatra, presented such an expert witness. All were, all that. So therefore, clearly, it would, the standard of review in that case made a huge difference. Because you had the expert witnesses, uncontroverted testimony. In these cases, you don't have an expert witness saying, if Mr. Jones or Mr. Sabatra returns to their respective countries, there is no, there is a likelihood. It is solely based on their own speculation, which, and I think it's important to consider here, the relief they're seeking, deferral removal under the convention against torture, requires them to establish that it is more likely than not, that they would be tortured if returned. Yeah. What you're saying is that the burden is on the petitioner. Exactly. The burden is on the petitioner to establish this. And from my reading of the immigration judge's decisions in both cases, it appears that he completely miscomprehended the appropriate burden of proof in these cases. Are you in a position to comment on Kaplan, the validity of the Kaplan opinion, or if you say no, I'll understand it. Respectfully, Your Honor, no, I am not. There are different folks in my office who will be making those determinations. At a different level, my guess is. Yes, that is correct, Your Honor. I can only point to the differences between the Kaplan case and this case. And again. And they are the amount of, so you think that in Kaplan, arguably there was sufficient evidence to sustain the administrative determination. Whereas in this case, because of the lack of an expert opinion, well, there's hardly nothing in Subrata, maybe a little more in Jones. Respectfully, I think the Kaplan decision, without speaking to the validity of it, it makes, in that case, the standard of review makes a difference. In Subrata, the board analyzed it under the correct standard of review. So, it's quite possible that the Kaplan case really doesn't have that much effect on Mr. Subrata's case because the board said, we're reviewing under clearly erroneous. And even in Kaplan, the court said, we're not saying that you're required to uphold the immigration judge's determination. This court said, we're going to remand it to you to apply the correct standard. Please enunciate and show that you are using the clearly erroneous standard rather than a de novo standard of review. If we were to, notwithstanding Mr. Filippini's suggestion that we not send it back for determination by the BIA, for reconsideration by the BIA, if we were to ask the government to file memoranda on the applicability of Kaplan to these two cases, how much time would the government need to do that? Two weeks? Two weeks should be sufficient for me to file such memoranda, Your Honor. Although, I would submit again. For you or others in your office. That would be for me to file the memoranda addressing Kaplan's impact on this case. Although, the time for seeking further review would obviously be longer than that two weeks for my office to determine. How much time has it to file a petition for a hearing? Pardon? How much time has it to file a petition for a hearing? I don't remember. I've been here so long, it's just gone out of my head. I believe a petition for a hearing would be due by May 11th, if I'm not mistaken, Your Honor. But again. It's about 30 days, yeah. And, Subhashra, I don't believe a remand would be appropriate because, again, the board analyzed it under the clearly erroneous standard alternative. As I understand Mr. Filippini's argument, that was a throwaway footnote, I think. That was the way I got. That was the impression I got from what he said. That we couldn't consider that a legal conclusion. I would respectfully disagree. The board made very clear. That was not a throwaway. The board said, alternatively, if we were to review this under the clearly erroneous standard. Didn't they put it in a footnote? Well, Your Honor, because I think it's, I think the context of that decision was issued. It's important to know why that was made in a footnote. Because at that time, matter of VK, was the controlling precedent for the board, as they're required to file, follow the Attorney General's decisions. And it says in the text after the footnote says, evidence was insufficient. Correct. I believe if you read that under the, under the context of VK was the controlling precedent. However, nevertheless, even if it weren't, that's not a throwaway, Your Honor. So you think that we, that there's a basis for us to deny, well, to grant the petition for review for the government. Let's see. We would be denying the petition for review. And Mr. Absolutely, Your Honor, because in that case, it's based on the insufficiency of the evidence under any standard. Correct, Your Honor. And I think the board's enunciation of that, and that Kaplan is irrelevant to Sobrata, whereas it certainly may be relevant in dividing the sitting together. Yes, Your Honor. I think that's true. Although Kaplan, again, the only way I would say it may impact Mr. Sobrata's case is again, there was no expert witness like in that case. But again, I think that's pretty much Kaplan's. I do have to tell you from my many years in practice, I don't think, I think anybody can get an expert to say anything. And the fact that they, and that was my problem with Kaplan too, the fact that they got an expert in Kaplan, although it may, knowing what we know about the Ukraine, I mean, there may be. There may be a solid basis, but again, again, I would just point out that although many people. I mean, how the Ukraine treated Jews. Exactly, Your Honor. But again, neither of these aliens did go, did get an expert to say that. So I think that speaks pretty highly. Well, but they were pro se. They've got pro bono people representing them here. They're not, although Mr. Jones was,  I mean, he had a PhD. He's a very sharp individual, Your Honor. Notwithstanding his criminal convictions. Administrative notice or judicial notice. Is this common for IJs to refer to other cases involving the same country? No. And same ethnic group? No, Your Honor. And in fact, the board's precedential decisions make clear that if an immigration judge wants evidence in the record, he should be putting it in there. That's why the immigration judges are required to put the State Department country reports, because so higher courts will have the ability and the same basis to review their decisions. The board's precedent decisions say that when immigration judges, because it used to be that some immigration judges might do something like this. They would say, well, I know the country report State X, so I'm just going to find that. And the board issued a published decision. I'm sorry, the name escapes me at this moment. I'd be happy to file a 28-J with that later, Your Honor. But it's, but the board said, if you're going to do this, you need to put that evidence in the record. But Mr. Filippini downplays the country report with respect to Indonesia, saying, he said, well, the, they relied on, I think it was the 2007 country report, but the, that's really not very different than the 2006-2005 report. Just a little, the underlying evidence is the same. They just came to a somewhat different conclusion. At least that's what I understood Mr. Filippini to say about the country reports in Indonesia. How do you answer that? Well, I would say that, I would say the ultimate question is if he's going to be detained. Nothing in the country reports say that returning aliens with criminal records abroad are detained. And in this way, I'd like to distinguish this case a bit from the Haitian cases that this court is pretty familiar with, having decided Pierre Auguste, Augusta, and the other cases. In those cases, in the State Department country reports, you have a statement that says, if an alien with a criminal record abroad is returned to Haiti, he will be detained. In both of these cases, for Nigeria and Indonesia, the State Department reports do not contain such a statement. And I think that's the key when evaluating my opposing counsel's suggestion. There's nothing in the State Department reports that say, if you have a criminal record abroad, you're going to be detained. And even Mr. Jones' case, where he was relying on the testimony of an alien who had been returned, that alien had a drug conviction, not a financial fraud conviction. And I think that, when you're looking at the State Department reports, that is key because, again, as the courts have acknowledged, those are the best sources for knowledge on the conditions in these countries. Okay. What? The 207 report was Indonesia. It's in the Sibroda case, and he was a drug person, right? Yes. Drug conviction. But the drug conviction, financial fraud distinction is relevant for Mr. Jones' case with Nigeria. Yes. And that distinction really is immaterial with respect to Indonesia. What about the 2007 report? I guess that was the one that said the torture conditions in Indonesia were improving somewhat. I think what it said was that the government was taking steps. Improved torture. That was a weird sentence. Sorry. I think what it said was the government of Indonesia was taking steps to arrest and prosecute folks in positions of authority who were doing such things. Okay. And is there any problem with the fact that that report wasn't in the record below? No. In fact, the court's decision in McLeod, I think it's a 1986 decision, says that the board should be doing exactly what they did in this instance. We can take judicial notice of country reports when they come out of our country, the State Department. When they come out of the State Department? Yes, Your Honor, but respectfully, the board may take administrative notice. This court may not. The court's precedent is held, and I think my motions to strike in Mr. Jones' case and the footnotes in both briefs make very clear that this court is only to consider the decision below based on the record made there. 1252A4A states, and this court has a multitude of decisions to say this court may not take judicial notice of current country reports, and I think I made that very clear in our motions to strike. You know, you're an expert when you deal with these cases, and let me just tell you what's been bothering me in all of these cases, and it's not only these because we get a lot of them. These people come into this country, sometimes illegally, but they stay. They're here now legally, and they do drugs. Does somebody go out into these communities and say, be careful, you can't do that because they're going to send you back? I don't know. Is there an absence of information that's going out? I mean, the results are so dire for these people. Respectfully, Your Honor, I think aliens... Do you have any idea? Respectfully, I think aliens like anyone else are presumed to know the law. I mean, that's a common concept, and I think it's no less applicable to them, especially in the case of Mr. Jones, who has a Ph.D., who should know that stealing from government money... Yeah, but he didn't do drugs. His problem wasn't drugs. His was money. He needed the money. And he was in this very responsible position in New York. Which makes it all the more egregious that he abused such public trust. But he was not the unwashed unknowing, whatever his problem was. But I'm concerned about whether the communities, somebody in the communities is explaining what's going on to these people. Well, Your Honor, I would note that the United States Citizenship and Immigration Service has a great website, which is very informative. You think these people are going on the computer and looking up the website? Well, Your Honor, and I would note that the government hands out... I mean, it's so unrealistic. The government hands out legal aid lists to people in proceedings. And, in fact, there are any number of community-based organizations which inform folks of their rights and responsibilities. Here, especially both of these, in Mr. Jones' and Mr. Subadra's case, they've been advised of these rights. Mr. Subadra particularly, having received asylum in this country, was on notice of the consequence of what may happen to him. I just think it's pathetic. I mean, because we get this in case after case. And I don't know that we can... It's not anything we can do anything about. And probably not you, but it seems the government is in a better position. I would agree with Your Honor, but I would just say that it's a privilege to be in the United States, and folks shouldn't abuse it. It should know better. Okay. Do you have any questions? The court has no further... Can I answer all those? No questions for me. Thank you, Your Honor. Okay, thank you. We'll hear from Jones a rebuttal. Thank you, Your Honor. Two minutes. I do wish that both of you would communicate with whoever it is, Nationality Center or somebody like that, to get across the point that there is some knowledge that should go out to these communities. Yes, Your Honor. Your guy isn't a drug... He's an educated person. No excuse at all, but go ahead. Thank you. Thank you, Your Honor. Just picking up on some of your concerns with the Subrata case, you mentioned that... But you're representing Jones. Yes, I am, representing Jones. But picking up on your concerns, you mentioned that there was... Not hard to confuse us. I'm so sorry. I'm usually the one who's confused as well, so I apologize. With respect to the issue of making a categorical holding that all Nigerians who are convicted of crimes here could never be deported, I don't think we have to reach that issue with Mr. Jones' case for a few reasons. Specifically, the government of Nigeria is aware, by virtue of the government's actions of the United States, that he's convicted of this foreign crime. You have, at issue of Mr. Jones' case, an extraordinary amount of money that he was convicted of embezzling. Are you talking about something that's not in this extra evidence? I perhaps may be discussing something that we had submitted the court could take judicial notice of, specifically the INS notification form that the government disregarded. Yes, Your Honor. Which is another reason why I believe this should be remanded for further adjudication and clarification before an immigration judge. Isn't there something called a motion to reopen? He hadn't made a specific choice to file his appeal to the Third Circuit. He had to file that while he was in prison, didn't have access to the library, and was afraid that his deportation proceedings would take place before he could file his motion for a stay in his appeal before the Third Circuit. What's the evidence that the government of Nigeria had notice of all this, other than the stuff that was added later? The stuff that was actually before the immigration judge? Well, Decree 13 is on the books, and that is a law that criminalizes foreign convictions of exactly the sort that Mr. Jones has. And the fact that they prosecute people with foreign crimes, that was actually well documented in the joint British-Danish report. And going back to one of your other further concerns, Judge Slavater, Mr. Jones' testimony was corroborated by the very record evidence that the immigration judge considered, namely the Human Rights Watch report, which documented that during interrogation, torture was widespreadly used throughout Nigeria. It's also documented that foreign convictions for fraud are prosecutable in Nigeria, and that's in that joint British-Danish report. And on the issue of administrative notice, I'd just like to, if you would indulge me for a few more seconds, I'd like to just point you to page 479 of Zubeda, in contradiction to what the government has asserted. At footnote 19, this court specifically says, we do not suggest that an immigration or administrative judge must always formally announce that he or she is taking administrative notice. Now, with respect to the State Department country reports, we are talking about autocratic and deplorable, well, we're talking about autocratic countries that have deplorable human rights conditions. And the fact that they are going to detain and deport people, those types of records are not easily found and easily identified. That is the very reason why immigration judges as specialists in this area should be taking administrative notice of things that are within their area of expertise. Thank you, Your Honor. Thank you. Thank you again. If I may respond to a couple of points. First, there is a concern about the evidence that was presented in the Sobrata case.  The lack of evidence. The lack of evidence. One thing that I would note, and this is important to one of the characterizations that Mr. Goring made, what the immigration judge found was not that there was insufficient evidence, but rather that there was insufficient evidence based on the complaints that Mr. Sobrata had presented. He had originally petitioned pro se to become, to have deferral based on his ethnic and religious bearing. And the IVA did not accept that. Exactly. But the administrative immigration judge did find consistent with the teachings. Wait a minute. The administrative. The immigration judge. Oh, okay. The immigration judge did find consistent with the responsibilities under both the United States Code and the Asinto case that there is an obligation to ferret out the information and the record when you're dealing with pro se plaintiffs. And if you look at pages six and seven of the administrative, I'm sorry, the immigration judge's opinion, he makes it very clear that what he has done was to understand the pro se nature of this party and tried to give that record the life that it deserves. He may not have had the wherewithal either to have counsel or to understand the law, but certainly there was a clear indication from the immigration judge that the concerns were real and were credible and were things that needed to be taken account of. Because I understand what Mr. Goring said to us, implied, was that, well, if you want to send Jones back for redetermination by the BIA, that's your decision. But don't do it as to Sobrata because there's just not enough evidence. How do you answer that? I would say that the record is complete in Sobrata as far as what was before the immigration judge. And what the BIA did was not find anything that was compelling to the contrary. Rather, it simply reweighed the evidence. Well, whose burden is it? It's the burden of the respondent in the action. But the immigration judge was very specific in his report that this was a pro se respondent and that in light of that, he needed to look at the evidence in a way that would really give full flavor to what has actually happened. Okay, thank you very much. We will take those matters under advisement. And once again, I thank the law firms for letting you come. And I guess you get to argue at least.